## NACOGDOCHES & SOUTHEASTERN RAILROAD COMPANY V. CARL BEENE.

### Decided November 22, 1907.

**1.— Personal Injuries—Discovered Peril—Evidence.**

In a suit for personal injuries caused by being run over by a railroad train while plaintiff was walking on the track, evidence considered, and held sufficient to support the finding of the jury that defendant's employees were guilty of negligence in failing to use the means at hand to stop the train after the peril of plaintiff was known to them.

**2.—Pleading—Overruling Exception—Harmless E1**

Where, in a suit for personal injuries, it appears from the face of the petition that the plaintiff was guilty of contributory negligence, the overruling of an exception to that part of the petition was harmless error when the court by its charge submits the case only upon the issues of discovered peril.

**3.—Pleading—General Demurrer.**

Where, in a suit for personal injuries, several grounds are relied upon for recovery and only one of such grounds is well pleaded, a general demurrer to the petition is properly overruled.

4.—Personal Injuries—Charge Approved.

In a suit for personal injuries charge upon discovered peril considered and approved.

Appeal from the District Court of Nacogdoches County. Tried below before Hon. Jas. I. Perkins.

*Ingraham, Middlebrook & Hodges,* for appellant.

*Henderson & Ford* and *Blount & Garrison,* for appellee.

PLEASANTS, Chief Justice.—This suit was brought by B. Beene, as next friend of his minor son, Carl Beene, against appellant to recover damages for personal injuries to said Carl Beene, alleged to have been caused by the negligence of the appellant. The petition alleges in substance that Carl Beene, while walking along the track of appellant, was run over by a train operated by appellant on said track, and one of his feet was thereby so mangled and crushed that it became necessary to have same amputated. The negligence alleged was the failure of the operatives of said train to ring the bell or blow the whistle or give any warning to said Carl Beene of the approach of the train, and further, that the employes of appellant who were operating said train, after they discovered the peril of said Carl Beene, failed to use the care required of them by law to prevent his injury.

The defendant answered by general demurrer, general denial and plea of contributory negligence on the part of said Carl Beene, in that at the time of his injury he was a trespasser upon defendant's track, and, knowing that a train was due about that time, failed to use any care whatever to discover the approach of the train and avoid being struck thereby.

The trial in the court below resulted in a verdict and judgment in favor of plaintiff in the sum of $6,000.

At the time he was injured Carl Beene was an employe of the Haywood Lumber Company, which company operates a lumber mill in the city of Nacogdoches. The appellant railway company operates a railroad from the forest to said mill. The railroad track extends from a depot, about 600 feet north of the mill, in a southerly direction along by the mill into the forest for a distance of ten or twelve miles. When the mill closed, about 6 o'clock in the evening of the day of the accident, Carl Beene, in company with a number of his co-employes, came out of the mill on the side by which appellant's track ran, and, getting upon said track, were walking thereon in a northerly direction to their homes. Just about this time a train on appellant's road, consisting of an engine and two empty flat cars, came in from the forest. This train blew the whistle for the crossing, which was some 300 or more feet south of the mill, and stopped there a sufficient time to allow a number of employes to get off. It then proceeded on up towards the depot for the purpose of getting on a sidetrack and backing into a shed or roundhouse. After passing the mill going north the track ran under a dolly-way in which there was a drawbridge.

The evidence shows that the whistle of the engine was blown several

times before reaching this drawbridge. After passing the drawbridge the track was straight, and any person walking thereon would be in plain view of the operatives of the engine. The engine was equipped with good brakes, which were in good condition, and the train could have been stopped in a few feet by the application of the brakes. The circumstances under which the accident occurred are thus detailed by the witnesses:

J. R. Stevens testified for the plaintiff as follows: "The train whistled at the commissary for the drawbridge, and the bridge was up when we got there. It whistled again just before it struck Mr. Beene; it blew three short jerks; Carl Beene was about 20 or 25, and maybe 30 feet from the engine when it whistled; it could not have been over that, and I do not think under 10 feet. I have had some experience running an engine; an engine running 12 miles an hour, with air brakes and emergency applied at once, would not go over 3 or 10 feet— say 10 feet—because an engine running 12 miles an hour with air fixtures—you can stop her by the time she turns over once; after the engine struck Beene the rear end of the engine went past him 5 or 6 feet; it went about the length of the engine and tender, which is about 33 feet."

G. R. Feltner, in charge of the engine, testified for the defendant: "I first discoverel Carl Beene on the track ahead of the engine about ten rail lengths; there were six, eight or a dozen more persons—some ahead of him, some behind him; all of the people stepped off the track except Carl Beene. I discovered that Carl Beene was in danger of being struck by the locomotive when I got near him; when I discovered his danger I would say that I was about three rail lengths, 90 feet from him. I blew the whistle; when I blew the whistle he was walking down the track, and as the whistle blew he stepped on the opposite side from me; I thought he had gotten off, and the next thing I knew the fireman hallooed 'look out,' and I thought the boy was off. When the fireman hallooed 'look out' I knew there was something wrong, and I applied the air as quick as I could; at the time the fireman hallooed to me I was sitting erect on the seat in front of the engine looking right down the track. The engine was not working steam, but was running by its own gravity. At the time I struck Carl Beene I was running slow—about four mile an hour. After I discovered plaintiff, in order to stop the engine all I had to do was to close my brake lever—just move it—as I usually hold the lever pretty near all the time when the engine is running; I think I had my hand on the lever at the time of the injury. I was within 120 feet of the place that I would have brought the engine to a standstill when it struck the appellee. I was about 700 yards from the place of the injury when I first blew the whistle coming in that evening. The next time I blew the whistle I was between the drawbridge and the commissary, which was about 350 yards from where Beene was injured. When I got to the drawbridge I saw him walking down the track. Men walked up and down the track there a great deal. It is commonly used by the employes. Carl Beene was probably three or four rail lengths from me after all the rest had gotten off the track, and Carl Beene was three or four rail lengths from me when I first discovered he was in a perilous and dan-

gerous condition something like 90 or 120 feet before I struck him. I could have stopped the train after I discovered Carl Beene's perilous and dangerous condition, and I could have stopped it in plenty of time to have kept from striking him after I realized his dangerous condition; after I first realized the perilous and dangerous condition he was in I kept my eye on him all the time until he passed out of my sight; I had my eye on him when I blew the whistle. I blowed the whistle for the purpose of warning him to get off. I was looking right at him at the time when I blew the whistle; he did not turn around to look, but stepped over to the other side out of my sight. He was 90 or 120 feet away when I blew the whistle. There was a path in the middle of the track, and he was in it when the whistle blew 90 or 120 feet from him. The rails are 4 feet, 8½ inches wide. There was an open window in front of me, and I could see him plainly walking in the middle of the track for a certain distance from the engine, but when I got close I could not for the position of the engine. I saw him within 30 or 60 feet of the engine after I blew the whistle."

"Q. After you realized his position did you blow the whistle any more except that time? A. Not at the time. When the fireman hallooed I blew four or five short blasts of the whistle.

"Q. At the time you first blew the whistle, did you apply the emergency air? A. No, sir.

"Q. How much further, after you blew the whistle, had you gone before you applied the air? A. I don't know; a short distance.

"Q. You must have gone 90 or 100 feet. A. No, 90 feet would put me right close to him. The train was running about 4 miles an hour. I never saw the appellee look around to see if we were coming. I don't know how close I was to him when I applied the emergency air; I could not see how close I was to him as he was out of my view.

"Q. If he was walking in the center of the track, and stepped to the left so you couldn't see him, that would make him plainer to Mr. Hill? A. Yes, sir.

"Q. He could see him all the time? A. I suppose he could.

"Q. Mr. Hill could have known that he did not get off the track when 120 feet from him? A. I suppose he could. There was nothing to prevent him from seeing from the position he occupied. Mr. Hill could have seen him perfectly plain. He did not tell me that he had not gotten off the track, and the first I heard was to stop—'look out.' I was watching the track—that was my duty. I knew that people were walking along the track, and saw people still further ahead of Carl Beene. I think all those ahead of Carl Beene had gotten off the track when he was struck. I had the window open, looking out the open window down the track. It is 12 or 14 feet from the window to the end of the engine.

"Q. A man on a straight track, if he stays between the rails, he can't possibly get out of the view of the engineer and fireman? A. If he stays in the middle of the track he would be out of view of both; of course, if he stepped to one side or the other, he would not. A man in the middle of the track would be out of my view something like two rail lengths.

"Q. How far would the train run in the time it would take a man

to get off the track? A. Possibly a rail's length or a half a rail's length at that speed, the best I could judge."

The witness Munsell testified for the plaintiff as follows: "I was working for the Heywood Lumber Company. When the engineer first blew the whistle, before striking Carl Beene, he was 75 or 100 feet from him. He blew six or eight short blasts. Carl Beene was walking right down the center of the track when the whistle was blown. When he was struck he was struck a little to the left coming this way, to the west, but I could not say how far he walked that way. I did not notice particularly whether he continued to walk right down the center of the track or played from one side to the other. When the train whistled the other men that were walking on the track stepped off of the track. I was right on the track, sitting down, waiting for the train to pass. I was sitting on the left-hand side, the same side that Carl Beene was struck on. When I saw that Carl Beene was going to be struck by the engine I hallooed, and did everything else, trying to notify him that the train was coming, and he never paid any attention to it. I never was able to get his attention. His face turned towards the left looking towards the T. & N. O. train. When I first saw Carl Beene he was walking the center of the track. He changed a little to the left just before the train struck him. He just stepped a little to the left and was coming on down the track; when he stepped to the left the whistle had already blown.

"Q. How long after the whistle had blown before he stepped to the left? A. Just immediately.

"Q. You say there were six or eight blasts? A. Yes, sir.

"Q. And just at the instant he stepped six or eight inches to the left? A. Yes, sir.

"Q. How far did he walk from the time the whistle blew till he was struck? A. About six feet, I think.

"Q. When did you halloo at him? A. When I saw he was in danger, when the whistle commenced blowing.

"Q. And you commenced hallooing right then? A. Yes, sir.

"Q. Did he pay any attention to your hallooing? A. No, sir. Just about the time the whistle was blowing I saw he was in danger, and was not going to get off, and I tried to get him off. A man sitting in the cab of the engine could see a person on the track 25 or 30 feet from the engine. When I first noticed Carl Beene he was on the east side; the whistle blew, and then he started diagonally across and got close to the west rail, but before he got off the track the engine struck him. I said to George Franklin, 'Look yonder; they are going to hit that boy,' and about that time they hit him. The engine ran about 200 feet after it began to whistle."

R. B. Hill, fireman, testified as follows: "I was on the engine, firing it, that ran over Carl Beene. When I first noticed him we were about 400 or 500 feet from him. When we struck Carl Beene we would have gone possibly 40 feet farther before we could have stopped. The engine was not working any steam. The throttle was shut off and the engine was running down hill. There was a number of parties walking down the track. I was ringing the bell, and the men began to get off the track along the line except Carl Beene. There was nothing else

done besides ringing the bell until we got close to him and the engineer sounded the whistle. We were some 10 or 12 or 15 feet, I presume—something like that—when the engineer blew the whistle. We were running about 4 or 5 miles an hour. When the engineer was blowing the whistle I could see Carl Beene, but after we got right close to him, if he walked either one side or the other, he would go out of our sight. The head of the engine cut off the view. He stopped a little bit from me, and I could not see him, and I looked over at the engineer to see whether he had discovered him, and I saw from his appearance that he had not, and I looked back, and there he was in about 6 feet of us, and I hallooed to the engineer to 'look out, there he was,' and he tried to stop, but it was too late. The engine run about 50 or 60 feet after we struck Carl Beene before we stopped. As soon as the engineer blew the whistle I saw immediately that Carl Beene did not hear it, and I knew he did not have much time to get off, and saw that he was not paying any attention to us or did not hear us. When Carl Beene went out of my sight I thought he had stepped off on the other side, and did not know any better until I saw him on my side again. I saw young Carl Beene walking down the track about 400 feet from us after all the rest had gotten off the track. I kept ringing the bell all that time, and continued to ring it till he was struck. I watched him all the time, and kept my eye on him continuously for 400 feet, and saw him walking down the track. He at no time turned round and looked to see if we were coming. He kept his back to us all the time. I saw from the way he was walking, and not looking back, that he had not discovered or seen us. He was 15 or 20 feet when the engineer blew the whistle. I had spoken to the engineer before he blew the whistle about him being on the track when we first saw him, about 400 feet; both of us made mention of it. We had gone a little ways after the engineer blew the whistle before I hallooed to him to look out. When the whistle blew Beene stepped a little east; this put him out of my sight, but would put him in view of the engineer When he stepped to the east he would be in the engineer's view, an. if he stepped to the west in my view. I hallooed to the engineer to call his attention to the fact that the boy was still on the track. The engine, in dry weather, when the air is applied, would stop right at once. It was a dry day on the evening Carl Beene was struck. I saw at the time that he did not know that we were coming and that he was going to be struck. It was a usual, every-day occurrence for the employes to use the track. We have instructions, when we come into the yard, to run slow, and to be careful. The engineer told me that he could not see the boy after he blew the whistle, and that he did not know whether he had gotten off the track or not, but supposed he had, and that after he had discovered him, within about 20 feet, that he thought he had gotten off the track until I hallooed."

We shall not discuss categorically nor in detail the numerous assignments of error presented in appellant's brief. The propositions submitted under many of these assignments are legally sound, but, in view of the fact that only the issue of discovered peril was submitted to the jury as ground for recovery, they are abstract and immaterial, and it would serve no useful purpose to discuss them.

We think the evidence before set out authorizes the finding that the operatives of appellant's train which caused the injury to Carl Beene discovered his peril in time to have avoided injuring him by use of the means at their command, and negligently failed to make use of such means to prevent said injury. This issue was fully and fairly submitted to the jury by the charge of the court, and no error is shown in the proceedings which would authorize this court to set aside the verdict. That the train could have been readily stopped in time to have avoided the injury to appellee after his peril was discovered by the engineer and the fireman is conclusively shown by the testimony before set out. It is equally clear that no effort was made to stop it until it was too late to avoid striking the appellee.

The engineer seeks to excuse his non-action in this regard by the statement that, after he blew the whistle to warn appellee of his danger, he, appellee, changed his course toward the opposite or fireman's side of the track, and the witness supposed he had gotten off the track, as he lost sight of him. The fireman contradicts this statement, and says the appellee, after the warning whistle was blown, got from the center of the track over on the engineer's side, and out of his, the fireman's, sight. Under this state of the evidence the jury were warranted in concluding that both the fireman and the engineer were negligent in failing, after having, by their own admission, discovered that appellee was not aware of the approach of the train, to stop the train without knowing, or having sufficient ground for believing, that appellee had heard the warning and would get off the track. These conclusions dispose of the assignments assailing the verdict on the ground that it is not supported by the evidence, and each of said assignments are overruled.

There is no merit in the assignment complaining of the refusal of the court to sustain a general demurrer to the petition. The contention, under this assignment, is that the petition shows upon its face that appellee was guilty of contributory negligence in being upon appellant's track, and in failing to use any care to discover the approaching train, and fails to allege any facts which would justify or excuse such negligence on his part. It may be conceded that an exception to that portion of the petition which sought recovery on the ground of negligence on the part of the operatives of the train in failing to give appellee warning of the approach of the train, should have been sustained on the ground urged under this assignment, but said exception was not valid as to the ground of recovery based on the alleged failure of the operatives of the train to use proper care to prevent the injury after they had discovered appellee's peril, and the general demurrer was properly overruled. The only ground of recovery submitted to the jury being based upon the issue of discovered peril, if any error was committed by the court in overruling exceptions to other portions of the petition, such error was harmless

The tenth assignment of error is as follows: "The court erred in the following paragraph of the charge, to wit: 'If the defendant, by its servants in charge of the engine, knew of Carl Beene's peril in time to have avoided the same, such knowledge imposed upon it the duty of using every means then within its power, consistent with the safety of

the engine and cars and the persons thereon, to avoid running him down or striking him, and failure to use such means would render the defendant liable, notwithstanding plaintiff may have been wrongfully on defendant's track; therefore, if you believe, from a preponderance of the evidence, that, after Carl Beene was discovered on the track in front of the approaching engine, defendant's servants in charge of the train negligently failed to use such care, attention and skill, and effort to stop or check up the train and avoid the collision with plaintiff, as they reasonably should, and could have done, after it reasonably became apparent to them that plaintiff would not get off the track, and if plaintiff received some or all of the injuries complained of in his petition through such fault of defendant's said servants, then you will find for the plaintiff for the reasons:'

"1.   It assumes plaintiff was in actual peril, and that the servants in charge of defendant's train discovered his peril in time to have stopped the train and avoided striking him.

"2.   It imposed a duty on defendant not imposed by law, and required it to keep a lookout for trespassers on its track.

"3.   It instructs the jury to find for plaintiff if plaintiff was discovered on its track in front of its approaching train, whether his peril was discovered or not.

"4.   It instructs the jury to find for the plaintiff if the servants in charge did everything in their power to avoid the collision after the peril was discovered.

"5.   It does not require that the jury find such negligence was the direct and proximate cause of the injury.

"6.   It imposes the duty on defendant to exercise reasonable care to ascertain plaintiff's being on the track, and that he would not get off, a degree of care not required or imposed by law.

"7.   It shifts the burden of proof upon defendant to prove it did not discover plaintiff's peril, and that it did use all means and agencies at their command to avoid the collision.

"8.   It does not define discovered peril or tell the jury when it would arise."

We think none of appellant's objections to this charge should be sustained. The charge is, in substance, the same as the one approved by this court in the case of International & G. N. Ry. Co. v. Munn, 102 S. W. Rep., 442, and we think correctly applied the law to the facts in evidence in this case.

We have duly considered all of the assignments of error presented in appellant's brief, and we think none of them should be sustained, and that the judgment of the court below should be affirmed.

*Affirmed.*

Writ of error refused.